IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LISA D. HAMMONS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 04-0270-CG-M |
| | ) | |
| GEORGE C. WALLACE STATE, | ) | |
| COMMUNITY COLLEGE and | ) | |
| JAMES M. MITCHELL, | ) | |
| | ) | |
| **Defendants.** | | |

## ORDER

This matter is before the court on the motion and brief in support of defendants' motion for summary judgment (Docs. 51, 52), plaintiff's response thereto (Doc. 66), and defendants' reply (Doc. 68). The court finds that plaintiff has not demonstrated prima facie cases of racial discrimination, sexual harassment, or retaliation against George C. Wallace State Community College. The court also finds that the facts taken in the light most favorable to plaintiff do not support a claim of fraud against James M. Mitchell. Plaintiff has conceded that summary judgment is due to be granted as to all other asserted claims. Therefore, defendants' motion for summary judgment is due to be granted in its entirety.

## FACTS

Plaintiff, Lisa D. Hammons, a white female, served as the Dean of Students at Defendant George C. Wallace State Community College (hereinafter "Wallace") located in Selma, Alabama. Plaintiff's complaint alleges that Wallace and her former supervisor, Dr. James M. Mitchell, (1) violated Title VII by discriminating against her in the terms, conditions and privileges of her employment because

of her sex and /or race; (2) violated Title VII by retaliating against her for making complaints to the

Chancellor of the Alabama Department of Post Secondary Education about Mitchell's harassment; (3)

breached her contract of employment; (4) fraudulently represented that she would not lose anything that

she had earned during her years of employment in Alabama's community college system; and (5)

deprived her of a property interest without due process in violation of the Fourteenth Amendment.

Plaintiff concedes that summary judgment is proper as to all federal law claims asserted against Dr.

Mitchell and all state law claims brought against him in his official capacity. (Doc. 66, p. 11).   Thus,

only the fraud claim remains against Dr. Mitchell and it is only asserted against him in his individual

capacity.  Plaintiff also concedes that Wallace is immune from the state law claims. (Doc. 66, p. 11).

Thus, only the Title VII discrimination and retaliation claims remain at issue against Wallace.

### Plaintiff's Position and Performance

In August 2000, plaintiff, a Caucasian female, applied for the Dean of Students position at

Wallace. (Hammons Depo. p. 35–36, 40–43 & Exs. 5–7).  Plaintiff, at that time, had 17 years

combined service with community colleges in the Alabama College System and was working as a

counselor at Bishop State Community College in Mobile, Alabama. (Hammons Depo. p. 17–18, 61).

Plaintiff interviewed with Dr. James Mitchell, a black male, on or about October 13, 2000. (Hammons

Depo. p. 50).  Several telephone conversations between plaintiff and Dr. Mitchell followed the

interview.   Dr. Mitchell formally offered plaintiff the Dean of Students job by letter dated November

13, 2000. (Hammons Depo., Ex. 8).   The letter stated the salary and directed plaintiff to the

Faculty/Staff Handbook, pages 54-55, for information on the leave she would earn. (Hammons Depo.,

Ex. 8).   The letter also stated she should contact Ms. Leigh Ann Morgan in the Business Office for a

2

copy of the handbook and for information concerning Alabama's Teacher Retirement, insurance, and other payroll related matters. (Hammons Depo., Ex. 8).  The letter did not mention anything about tenure or a probationary period.  Before plaintiff accepted the job offer at Wallace, she discussed with Dr. Mitchell, via telephone, questions she had about the offer. (Hammons Depo. p. 61).  Plaintiff asked Dr. Mitchell about her salary designation as Step 15, instead of Step 17, on Salary Schedule B. (Hammons Depo. p. 61).  Dr. Mitchell indicated to plaintiff that he could not place her at Step 17 because such a level did not exist on Salary Schedule B, an answer that satisfied plaintiff. (Hammons Depo. pp. 62, 63).  Dr. Mitchell told plaintiff that she "would not lose anything to come up there and work for him." (Hammons Depo. p. 65).  Plaintiff admits that during this conversation they "didn't say the word tenure exactly" and that they did not discuss tenure. (Hammons Depo. p. 66).

On November 20, 2000, plaintiff accepted the Dean of Students position at Wallace, effective January 2, 2001, at the salary of $83, 905.  (Hammons Depo., Ex. 8).  This position was a promotion for plaintiff and resulted in a salary raise of approximately $20,000. (Hammons Depo. p. 62).   Dr. Mitchell offered, and plaintiff accepted, another letter of appointment for Dean of Students at Wallace, effective September 1, 2002, through August 31, 2003, at the annual salary of $85,396. (Hammons Depo. Ex. 21).

As Dean of Students at Wallace, plaintiff was responsible for  the general oversight of the Division of Student Services. (Hammons Depo. p. 71).  The Division of Student Services included the Admissions Office, the Registrar's Office, Student Support Services, Talent Search, Financial Aid, as well as the Athletic Department and ADA compliance. (Hammons Depo. pp. 71–72; 212–213).   In the Fall of 2001, plaintiff also assumed the duty of Wallace's Athletic Director. (Hammons Depo. pp.

3

73–74).  Plaintiff reported to Dr. Mitchell.  (Hammons Depo. pp. 76–77).  As Dean of Students and

Athletic Director, plaintiff served as the direct supervisor for approximately 10 staff members and

coaches, including Corey Bowie, financial aid director; Donitha Griffin, counselor; and Raji Gourdine,

director of student support services.  (Hammons Depo. pp. 78–79).

       Plaintiff's first performance evaluation indicated that she was performing above-average.  In

fact, Mitchell commented on her evaluation that she was a valuable member of the administrative team

and that she had done an outstanding job in a short period of time.  However, he also commented that

she needs to coordinate registration better.   The evaluation covered the period from January 2001 to

September 2001.  (Hammons Depo., Ex. 23, p. 4).

       On January 10, 2002, Dr. Mitchell sent plaintiff a memorandum praising her for the "great job"

she had done in her first year. (Mitchell Depo. p. 122-126 & Pl.'s Ex. 6). However, according to Dr.

Mitchell, as early as Fall 2001, he noticed problems with a lack of organization and communication

within the student services division related to registration. (Mitchell Depo pp. 188–189).  With time,

Dr. Mitchell states that he began to notice problems with plaintiff's job performance as Dean of

Students at Wallace and expressed numerous concerns to her.  According to plaintiff, Mitchell began

treating her differently immediately following her sending a critical memo on August 13, 2002, to a

black subordinate, Doritha Griffin.

       In August 2002, Dr. Mitchell expressed to plaintiff concerns he had about the registration

process for Fall semester of 2002. (Hammons Depo. pp. 209–214 & Ex. 24).  In a memorandum to

plaintiff dated August 14, 2002, Dr. Mitchell commented on the "lack of planning and coordination of

the registration process," complaining that "this is another incident of poor planning, poor

communication, and poor organization." (Hammons Depo., Ex. 24, ¶¶ 1, 2).  Dr. Mitchell stated that

he found himself "having to spend too much time dealing with day to day operational matters with

[plaintiff's] division." (Hammons Depo., Ex. 24 at ¶ 3).

On August 27, 2002, Dr. Mitchell held a meeting with plaintiff, Dean Allen, and Corey Bowie

about concerns he had with financial aid. (Hammons Depo. pp. 213–214).  Items discussed at this

meeting were included in a follow up memorandum, dated August 29, 2002, from Dr. Mitchell to

plaintiff. (Hammons Depo pp. 214–215 & Ex. 28).  In his memorandum, Dr. Mitchell cited the "lack of

organizational structure and established procedures in the Division of Student Services" and plaintiff's

ignoring or evading problems in financial aid. (Hammons Dep., Ex. 28).  He also indicated that he was

bringing in someone to conduct a peer review and mandated that all reports and applications discussed

in the meeting must be completed by the stated deadlines. (Hammons Depo., Ex. 28).  Also in August

2002, Dr. Mitchell wrote a memorandum to plaintiff regarding her absences from the office. (Hammons

Depo. pp. 210–211 & Ex. 26).  In this memorandum, Dr. Mitchell stated that on previous occasions

plaintiff's staff did not know her whereabouts and that he did not "normally conduct the majority of

business with senior administrators via cell phone or email." (Hammons Depo., Ex. 26).  Dr. Mitchell

testified that there were problems with plaintiff simply "being missing" from her office or the campus.

Dr. Mitchell especially  noticed this problem during "the last four or five months" of plaintiff's time at

Wallace. (Mitchell Depo. p. 224).

According to Mitchell, by at least January 2002, problems in the area of financial aid began to

appear.  As Dean of Students, plaintiff was responsible, through her financial aid director, for soliciting

and receiving student applications for various Pell Grant funds, promptly submitting the application

information to the U.S. Department of Education, receiving confirmation that the applicant qualified, and distributing the funds to the student once the funds were received.  Students who qualified were entitled to receive the funds no later than 14 days after the first day of class.  If the college (because of late submission of the application data) did not receive the funds by the deadline, the college had to borrow money to advance to the students. Such an action would cost the college thousands of dollars in lost interest plus the college risked paying students who might later be declared ineligible. (Mitchell Depo., Ex. 10 at  pp.  4-5).

In January 2002, it surfaced that Hammons' office delayed submitting any of the data until well after school was in progress. (Allen Depo. pp. 77, 79).  In an apparent effort to minimize the effort involved, the office was permitting apparently-eligible students to register for class and to begin classes. The office was then waiting until after the deadline for dropping or adding classes to submit any of the data -- thus eliminating the need to make any adjustments in the data that had been submitted, as students added or dropped courses. (Mitchell Depo., Ex 10 at p. 5).  Wallace did receive the funds in time, but it was just before the deadline for distribution of the funds.  The problem was brought to Hammons' attention and she was instructed to make changes in procedures to ensure that in the future, all student application data would be promptly forwarded to the U.S. Department of Education without any delay. (See Hammons Depo. Ex. 28).

The problem recurred in January 2003.  The day before the deadline for distributing Pell Grant funds in the amount of $795,525.26, Dr. Mitchell learned that the college had yet to receive any of the funds and had no indication of when they would be deposited.  The President immediately contacted the bank and began making arrangements to withdraw funds from the college's own account to pay the

6

students.  In January 2003, Dr. Mitchell wrote plaintiff about distribution problems with the Pell Grants.

(Hammons Depo. pp. 217–218 & Ex. 31).   Dr. Mitchell was concerned about why the college did not

receive authorization for the electronic request for approximately $800,000 in U.S. Department of

Education funds until the last minute. (Hammons Depo., Ex. 31 ¶ 1).  He cited this situation as "another

example of [plaintiff's] weak organizational and administrative skills" and noted that the "same process

and procedural problems [kept] occurring." (Hammons Depo., Ex. 31 ¶ 2).   Dr. Mitchell concluded

the memorandum by stating that he was "not satisfied at all with [plaintiff's] level of performance as

Dean of Students." " (Hammons Depo., Ex. 31 ¶ 3).   The funds arrived on the very last day.  If it had

been necessary for the college to withdraw the $795,525.26 from its own account, the cost to the

college in lost interest would have been considerable. (Hammons Depo., Exs. 29, 31).

        In the Fall of 2002, Dr. Mitchell indicated concerns that he had with plaintiff's performance in

her evaluation. (Hammons Depo., Ex. 35).  On her evaluation, Dr. Mitchell rated plaintiff's

performance as average and wrote that although she had performed well in some aspects, "[s]he is very

weak on organizational and administrative skills." (Hammons Depo. Ex. 35).   He also noted that she

needed "to improve on communication within her division, and with external college divisions, and the

general public" and "to develop a system of priority within her division and the college." (Hammons

Depo. Ex. 35)

        On or about December 5, 2002, Dr. Mitchell called plaintiff to his office to talk about a

"situation with INS." (Hammons Depo. p. 170).   Bonita Allen, Dean of Business and Finance, and Raji

Gourdine were present at that meeting. (Hammons Depo. p. 174).  On December 11, 2002, Dr.

Mitchell wrote a memorandum to plaintiff regarding her "disrespectful behavior and attitudes" during the

December 5th meeting, as well as other meetings, held in his office. (Hammons Depo p. 176 & Ex. 17).

Dr. Mitchell officially reprimanded plaintiff on December 20, 2002, for the "situation with INS" which

involved plaintiff's release of the college's bank account number to the Immigration and Naturalization

Service (INS), so that INS could debit the account $580.00 to permit the school's admission of

international students. (Hammons Dep., Ex. 16).  In his memorandum, Dr. Mitchell explained that only

he and Bonita Allen, Dean of Business and Finance, had authority to approve the electronic transfer of

college funds. (Hammons Depo., Ex. 16, p. 1).   He further accused plaintiff of requesting the check for

INS, knowing that INS did not accept checks, and then instructed Raji Gourdine to enter the account

number on the check into the INS website for the INS to debit the account without proper approval.

(Hammons Depo., Ex. 16, p. 1).  According to the memorandum, after entering the information from

the check onto the website, plaintiff neither alerted the Business Office of the transfer nor returned the

check to that office. (Hammons Depo., Ex. 16, p. 1)

Dr. Mitchell wrote a memorandum to plaintiff on April 14, 2003, in which he expressed his

"disappointment" that she was not present at the ACE 2003 Awards Ceremony on April 11, 2003.

(Hammons Depo p 225 & Ex. 37, ¶ 1).  He characterized her absence as "unprofessional behavior"

and stated that he had "higher expectations for senior administrators at Wallace." (Hammons Dep., Ex.

37, ¶ 2).

In 2002-2003, the financial aid office under plaintiff's supervision, over awarded funds to

work-study students. (See Mitchell Depo. pp. 177–178).  The College is also eligible to receive

Alabama Student Assistance Program (ASAP) funds for certain students who have financial needs.

Any funds that are not distributed must be returned. Despite the fact that there were more than enough

students who were eligible for the funds, in Fall 2002, the financial aid office failed to award $5,000 of

the funds.  As a result, the College had to return the $5,000 and qualified students who needed the

funds were unnecessarily deprived of financial aid.  The situation was brought to Hammons' attention

and she was instructed to ensure that this did not recur. (Mitchell Depo., Ex. 10. at p. 6).  The ASAP

problem occurred again the following year.  In Spring 2003, the financial aid office failed to disburse

approximately $4,300 in ASAP funds.

        In an effort to help Hammons identify the problems in her division and correct them, the college

retained the services of three separate consultants on three separate occasions. Each time, each of the

consultants identified problem areas and made specific recommendations as to how to correct the

problems. However, according to Mitchell, few of the consultants' recommendations were

implemented by Hammons and the problems continued to recur. On May 7, 2003, Kimberly Carter

conducted a peer audit of the Financial Aid Office and reported numerous continuing deficiencies.

Carter met with Dr. Mitchell on May 7 as well.  Carter noted the same deficiencies in the handling of

Title IV funds that had continued under Hammons' supervision.  According to Mitchell, this was the

"last straw" and led Dr. Mitchell, on May 14, 2003, to place plaintiff on administrative leave and inform

her that her contract would not be renewed. (Mitchell Depo., Ex. 10 at p. 6).

        Dr. Mitchell testified to additional problems encountered during plaintiff's time as Dean of

Students at Wallace. One of these concerned her failure to "relate to students." (Mitchell Depo. p.

134).  Dr. Mitchell testified that her problem relating to students "was overall in terms of a dean of

students meeting and interacting students . . . in terms of activities, in terms of being highly visible, in

terms of even going through the student center to converse with students, and that's important.  That's

the major student advocate on campus." (Mitchell Depo. p. 222).  According to Mitchell, Hammons

avoided meeting with students in person.  Dr. Mitchell also testified that he received complaints from

parents, students, faculty, and staff that Hammons was rude and abrupt in her dealings with others.

(Mitchell Depo. p. 225).   For example, Dr. Mitchell received two or three calls from parents

complaining that plaintiff simply hung up on them in the middle of a telephone conversation. (Mitchell

Depo. p. 226).

     Plaintiff responded by memorandum or other written form to some of Mitchell's memoranda,

often challenging the validity contained therein. (Hammons Depo., Exs. 25, 32, 33, 36, 38, 39).  On at

least two occasions, Dr. Mitchell replied in writing to plaintiff's memoranda. (Hammons Dep., Exs. 18

& 39).

**Plaintiff's Allegations of Sexual Discrimination**

     Plaintiff has identified several instances during which she claims Dr. Mitchell made sexual

advances towards her.  Dr. Mitchell denies making any sexual advances or comments toward plaintiff.

(Mitchell Depo. pp. 144-146).   According to plaintiff, Dr. Mitchell told plaintiff on her first day that she

was to be loyal only to him. (Hammons Depo. p. 88).  Mitchell also told plaintiff on that day that the

president of Wallace had once walked in on the vice president of instruction and the president's former

secretary having sex on the sofa. (Hammons Depo. p. 88).

     In February 2002, Dr. Mitchell reportedly called plaintiff at home at 10:30 p.m. (Hammons

Depo. p. 89).   The phone call lasted until about 4:00 a.m. (Hammons Depo. p. 94).   According to

plaintiff, "practically the entire conversation was about sex." (Hammons Depo. p. 91).  Plaintiff

attempted to change the subject but the conversation kept returning to the subject of sex. (Hammons

10

Depo. pp. 99-100).  Dr. Mitchell told plaintiff that another employee, Dr. McConnell, thought he was a

lady's man and that he was going to be coming after plaintiff for sex. (Hammons Depo. pp. 91, 97).

Mitchell also stated that half of the presidents in the Alabama college system were gay, but that he liked

women. (Hammons Depo. pp. 91-92).   He also told plaintiff that two other employees had or were

having an affair. (Hammons Depo. p. 92).  He stated that some college presidents had girlfriends who

traveled with them. (Hammons Depo. p. 237).  Mitchell also commented that he wanted to be the

chancellor of North Carolina and that plaintiff could be his vice chancellor (Hammons Depo. p. 238).

According to plaintiff, Dr. Mitchell did not directly ask her for sex, but he implied it by asking about her

house and her bedroom and telling her he wanted to come over and see the house sometime.

(Hammons Depo. pp. 101-103).  Plaintiff did not tell Dr. Mitchell that she wanted to end the

conversation or that she did not wish to talk about things of a sexual nature. (Hammons Depo. pp. 100,

111-112).

      In March 2002, Dr. Mitchell is alleged to have called plaintiff at home a second time around

8:30 or 9:00 p.m. (Hammons Depo. pp. 104-105).  Plaintiff reports that she told him she could not talk

at that time and that she would call him back. (Hammons Depo. pp. 105-106). The phone call only

lasted approximately three minutes and Mitchell did not contact plaintiff at home again after this second

call. (Hammons Depo. pp. 106, 108).

      In April 2002, while they were attending an all USA academic awards banquet, Dr. Mitchell

asked plaintiff if she wanted to go out for drinks. (Hammons Depo. p. 112-113).  Plaintiff brought a

friend and met Dr. Mitchell at a bar and they each had about 2 drinks. (Hammons Depo. pp. 114-

116).  While at the bar, plaintiff was never left alone with Dr. Mitchell, and Dr. Mitchell did not say

11

anything of a sexual nature. (Hammons Depo. pp. 115, 121). They talked about community college things and all left at the same time. (Hammons Depo. p. 117).

Plaintiff states that in the Spring of 2002, while they were walking on campus, Dr. Mitchell stated to her that women sleep with their bosses to keep their jobs and get promotions. (Hammons Depo. p. 121). They had been talking about jobs and different skills and talents that administrators need to do their jobs. (Hammons Depo. p. 123).   At the time, plaintiff did not think Mitchell was talking about plaintiff, but was instead just saying that it happens. (Hammons Depo. p. 123).

Also in the Spring of 2002, Dr. Mitchell asked her to drive his state-issued vehicle from campus to his home while he drove his personal vehicle to the house. (Hammons Depo. pp. 125, 128,133). Plaintiff then traveled back to campus from Dr. Mitchell's home with him in the state-issued vehicle. (Hammons Depo. p. 134). When plaintiff arrived at Dr. Mitchell's home, plaintiff claims that Dr. Mitchell stood in the doorway of his home and stared at her while she waited in the vehicle in his driveway. (Hammons Depo. pp. 130–131). Plaintiff believes Mitchell's actions were an attempt to get plaintiff to come inside. Plaintiff became uncomfortable so she backed her car up and Mitchell then came out to her car.   Dr. Mitchell did not say anything of a sexual nature to plaintiff while they were in the vehicle. (Hammons Depo. pp. 134–135).

Plaintiff also states that in Spring of 2002 during lunch with Dr. Mitchell, he mentioned again to plaintiff about the vice president of instruction and the president's secretary having sex on the sofa. (Hammons Depo. pp. 143–144). Dr. Mitchell said that the previous president, Dr. Brown, was mad because the secretary should have been having sex with Dr. Brown and owed her loyalty to Dr. Brown. (Hammons Depo. pp. 143–144). Dr. Mitchell did not ask plaintiff for sex during this conversation.

12

(Hammons Depo. p. 143).

According to plaintiff, on repeated occasions, Dr. Mitchell "leered" at plaintiff in a sexually suggestive way, but Dr. Mitchell never touched plaintiff in an inappropriate or sexual way. (Hammons Depo. p. 136, Ex. 12, p. 4, Answer to Interrog. No. 6). Plaintiff does not believe that the decision not to renew her contract in May 2003 was motivated by her gender. (Hammons Depo. p. 156).

### Plaintiff's Allegations of Racial Discrimination

Plaintiff, who is Caucasian, has identified several instances where she claims she was a victim of racial discrimination. First, plaintiff states that Dr. Mitchell inquired about the 2002 evaluation scores of two Wallace employees that plaintiff rated. (Hammons Depo. pp. 136–137). Apparently, plaintiff rated an African-American employee lower than a Caucasian staff member, and Dr. Mitchell warned plaintiff that he was "going to do something about it" if the conduct was racist. (Hammons Depo. p. 137). The evaluation scores of these individuals were not changed. (Hammons Depo. p. 138). Plaintiff believes that Dr. Mitchell's "preferential treatment" of Wallace Counselor Donitha Griffin, who is African-American, is evidence of racial discrimination. (Hammons Depo. p. 139). As a counselor in the Student Services Division, Ms. Griffin is responsible for academic, personal, and financial aid counseling. (Mitchell Depo. pp. 127–128). According to plaintiff, Dr. Mitchell would bypass plaintiff, who supervised Ms. Griffin, and tie plaintiff's "hands when it came to the smooth operation and flow of the office." (Hammons Depo. pp. 139, 141-142). Dr. Mitchell allegedly spent excessive time in Ms. Griffin's office, sent Ms. Griffin to conferences, and assigned her projects without plaintiff's permission. (Hammons Depo. pp. 139, 149). Dr. Mitchell had authority as Wallace President to give faculty and staff assignments, including subordinates that plaintiff supervised without plaintiff's prior approval.

(Hammons Depo. pp. 145-146).   Plaintiff believes that Dr. Mitchell was "grooming" Ms. Griffin for the

position of Dean of Students at Wallace. (Hammons Depo. pp. 150, 151).  Dr. Mitchell indicated to

plaintiff in 2001 that Ms. Griffin knew she was next in line for that position. (Hammons Depo. pp. 151,

152).  However, Ms. Griffin has never served as Dean of Students, and only Dr. Gail May has held

that position since plaintiff's departure. (Hammons Depo. pp. 150-151).

Plaintiff also says that she has had conversations with Dr. Mitchell "about opportunities for

African-Americans." (Hammons Depo. p. 148).  On one occasion, during a lunch with plaintiff and

Bonita Allen, Dr. Mitchell spoke to Ms. Allen, who is African-American, "about going to get her

doctorate and that there would be—there were opportunities for minorities and that type of thing."

(Hammons Depo. p. 148).  Plaintiff also heard Dr. Mitchell talk about "different aspects with the civil

rights movement and that type of thing." (Hammons Depo. p. 148).

### Plaintiff's Complaint to the Alabama Dept. of Postsecondary Education (ADPS)

On December 17, 2002, plaintiff mailed a letter to Dr. Roy Johnson, Chancellor of ADPS.

(Hammons Depo. p. 158 & Ex. 13).  The letter states that its purpose is to file a grievance against

Mitchell

> for harassment, slander, libel, defamation of character, verbal and physically abusive
> behavior, making false statements, disparate treatment, for threatening my career, and
> for generally unprofessional conduct against me and my staff.

(Hammons Dep. Ex. 13, p. 1).  In the letter, plaintiff did not mention any of the previously- described

incidents of alleged sexual harassment or racial discrimination. (Hammons Depo. p. 159 & Ex. 13).

The letter describes Dr. Mitchell's angry criticism of her in front of others concerning her handling of the

INS fund transfer.  Plaintiff's letter also complains of a letter Mitchell sent to parents of Wallace's

14

baseball team in which he allegedly implied that the coach and plaintiff were responsible for a decision that had been made to reduce the number of games that would be played.  Plaintiff's letter indicates that the above incidents are not exhaustive and that she has been subjected to harassment, threats, abusive language, and conduct intimidation and generally unprofessional conduct for several months.   The letter also states that Mitchell has continually threatened to fire her and reminded her that she was not tenured. (Hammons Depo. Ex. 13).   Dr. Johnson responded in writing to plaintiff through a letter dated January 23, 2003, in which he informed plaintiff that her request for a grievance against Dr. Mitchell was denied because she had not filed a complaint as provided by ADPS Board Policy. (Hammons Depo. pp. 160–161 & Ex. 14).  State Board of Education Policy 620.01 sets forth the procedure for making such complaints. (Hammons Depo., Ex. 15).   Plaintiff did not attempt to file another grievance in accordance with the policy. (Hammons Depo. p. 162).  Instead, in February 2003, she contacted Joan Davis, ADPS's attorney, who informed her that plaintiff served at the pleasure of the president. (Hammons Depo. pp. 163–165).

### The Non-Renewal of Plaintiff's Contract and Her Replacement

On May 23, 2003, Dr. Mitchell informed plaintiff that her contract for the 2003–2004 academic year was not going to be renewed. (Hammons Dep., Ex. 22).  Dr. Mitchell gave plaintiff a letter stating  that plaintiff was a probationary employee because she had been employed by Wallace for less than three years. (Hammons Dep., Ex. 2.) Effective that date, plaintiff was placed on administrative leave with full pay and benefits through August 31, 2003, when her contract expired. (Hammons Dep. at 198).  Dr. Gail May, a business instructor at Wallace, became the Interim Dean at the conclusion of summer classes. (May Depo. pp. 20, 27).  After a year-long search, Dr. May was

selected as the permanent Dean of Students. (May Depo. pp. 11, 61–64).  Between the time of Dr.

Hammons' departure in mid-May and Dr. May's assumption of Interim Dean in early Fall, Donitha

Griffin, a Wallace Counselor, was responsible for "most of the duties" of the Dean of Students position.

(May Depo. p. 33).  Ms. Griffin signed certain papers and handled the day-to-day operations of that

office. (May Depo. p.  34).  Ms. Griffin performed these additional duties without a raise or a

supplement to her salary as a counselor. (Cosby Decl. ¶ 4(b)).  When Dr. May became the Interim

Dean of Students, Ms. Griffin did not retain any duties of that position. (May Dep. at 34).  It is

undisputed that Ms. Griffin never served as Dean of Students at Wallace, and, at the time of plaintiff's

departure, Ms. Griffin was not qualified for that position. (Hammons Dep. at 150–151, 153).

## A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."   The trial court's function is not "to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).   "The mere existence of some evidence to support the non-

moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284

F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249.

(internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252.

The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e) "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

17

**B. Claims against Wallace**

Plaintiff maintains that Wallace violated Title VII by (1) discriminating against her in the terms, conditions and privileges of her employment because of her race; (2) sexually harassing her; and (3) retaliating against her for making complaints to the Chancellor of the Alabama Department of Post Secondary Education about Mitchell's harassment.

A  plaintiff may prove discrimination or retaliation by relying on either direct, circumstantial, or statistical evidence.  See Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1555 (11th Cir. 1995) see also Wright v. Southland Corp., 187 F.3d 1287, 1305 (11th Cir. 1999) ("the same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the McDonnell Douglas presumption." citation omitted).    Direct evidence is evidence which, "if believed, proves the existence of discriminatory motive 'without inference or presumption'" Hamilton v. Montgomery County Bd. of Educ., 122 F.Supp.2d 1273, 1279 (M.D. Ala. 2000) (quoting Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998)).  As the District Court for the Middle District of Alabama explained:

> Not only must it be evidence of discriminatory 'actions or statements of an employer' but the actions or statements at issue must 'correlat[e] to the discrimination or retaliation complained of by the employee.' Further, the statements 'must be made by a person involved in the challenged decision' and must not be subject to varying reasonable interpretations.

Id. (quoting Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261, 1274 (M.D. Ala. 1998)).   The court does not find that any of the evidence submitted by plaintiff qualifies as direct evidence of discrimination or retaliation.  None of the evidence offered proves without inference or presumption that the person who made the employment decisions did so as a result of a discriminatory or retaliatory motive.

Plaintiff may attempt to show discrimination and retaliation based on circumstantial evidence through the application of the McDonnell Douglas burden-shifting analysis established by the Supreme Court. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas framework, a plaintiff must first raise an inference of discrimination or retaliation by establishing a prima

facie case. See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir.1997)).

Assuming for the purposes of argument that plaintiff could establish a prima facie case, the burden would then shift to the defendant, who must "proffer a legitimate, non-discriminatory reason for the adverse employment action. The employer's burden is exceedingly light." Hamilton, 122 F.Supp.2d at 1280 (quoting Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal quotations omitted)). If the defendant proffers a legitimate reason for the employment decisions, the burden then shifts back to plaintiff, who must show that the employer's proffered reasons are pretextual, or merely a cover for discrimination. Id. "At the pretext stage, in order to survive summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the employer's decision." Miller v. Bed, Bath & Beyond, Inc., 185 F.Supp.2d 1253, 1270 (N.D. Ala. 2002) (citing Combs, 106 F.3d at 1538). Plaintiff may do this "(1) by showing that the employer's legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision." Id. (citations omitted). "This is done by pointing to 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.'" Hamilton, 122 F. Supp.2d at 1281 (quoting Combs, 106 F.3d at 1539). The ultimate burden of persuasion remains with the plaintiff at all times in cases involving merely circumstantial evidence. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

In satisfying the ultimate burden of proving that the adverse employment action was on account of race, a plaintiff need not establish that race was the sole reason for the action, but that it was a determinative factor in the employer's decision. See Anderson v. Savage Laboratories, Inc., 675 F.2d 1221, 1224 (11th Cir. 1982) (citing Haring v. CPC International, Inc., 664 F.2d 1234, 1239-40 (5th Cir. 1981)). However, it should be noted that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." Chapman, 229 F.3d at 1030 (quoting Elrod

v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)).  It is not appropriate for either the

plaintiff or this court to "recast an employer's proffered non-discriminatory reasons or substitute his

business judgment for that of the employer." Chapman, 229 F.3d at 1030.

### 1. Racial Discrimination

To establish a prima facie case of racial discrimination, plaintiff must show that:

(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was replaced by a person outside h[er] protected class or was treated less favorably than a similarly-situated individual outside h[er] protected class.

Maynard v. Board of Regents of Div. of Universities of Florida Dept. of Educ. ex rel. University of

South Florida,  342 F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell-Douglas, supra).  It is

undisputed that plaintiff is a member of a protected class and that she suffered an adverse job action

when she was put on administrative leave and her employment contract was not renewed.   However,

plaintiff was not replaced with someone outside her protected class and defendants deny that similarly-

situated employees outside her classification were treated more favorably.   Plaintiff contends that in

relation to the non-renewal of her employment contract, Dr. Mitchell treated two African-American

employees more favorably.  According to plaintiff, the Financial Aid Director, Corey Bowie, and

Bonita Allen, who was partially responsible for training Mr. Bowie, were more to blame for the financial

aid problems than plaintiff.    To be appropriate comparators the employees must be "similarly situated

in all aspects." Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir.1997).  "The comparator must be

nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the

employer." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir.2004) (internal citations

omitted).   It is highly questionable whether Corey Bowie could be considered similarly-situated since

he is plaintiff's subordinate.  See Wehunt v. R.W. Page Corp., 352 F.Supp.2d 1342, 1352, n 3 (M.D.

Ga. 2004) (Employee working as plaintiff's subordinate "clearly had different job duties and cannot be

considered similarly situated to Plaintiff."); Etienne v. Muvico Theaters, Inc., 2003 WL 21184268, *13

(S.D. Fla. 2003) ("Mr. Etienne's duties as senior manager - which included overseeing the activities of

the other managers - differed and were separate from those of the other managers. To a significant extent, Mr. Etienne, by virtue of his position, was not "similarly situated" in certain respects to the other managers. As such, Mr. Elder could legitimately hold Mr. Etienne responsible for cash accounting problems occurring under his watch.").   The scope and level of plaintiff's responsibilities is clearly different from her subordinate, Corey Bowie.   Bonita Allen is alleged to be on the same level as plaintiff and to have had a supervisory position over Corey Bowie.  Plaintiff alleges that Allen and Bowie were more responsible than plaintiff for the problems that occurred in Financial Aid.  However, not all of the problems for which plaintiff was criticized occurred in the Financial Aid Department. "[T]he comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir.2001) (citation and internal quotations omitted).  Moreover, both Corey Bowie and Bonita Allen had worked at Wallace for much longer than plaintiff.[1]  They would presumably not have been probationary employees but instead would be tenured.   As such, they were not at-will employees like plaintiff and are clearly not similarly-situated. See Moore v. State of Ala.,  989 F.Supp. 1412, 1419, n. 6 (M.D. Ala. 1997) (During the evaluation of the prima facie case "courts should focus on whether employees are similarly situated in terms of disciplinary record and employment status, i.e., whether the employee is probationary, tenured, part-time, etc..."); see also Russell v. Drabik, 24 Fed.Appx. 408, 413 (6th Cir. 2001) ("As a matter of law, classified (tenured) and unclassified (untenured) employees are not similarly-situated." citation omitted).

Plaintiff also claims that there were other instances, in addition to her contract not being renewed, in which she suffered racial discrimination.  Dr. Mitchell questioned her rating of an African-American employee stating that if it was racist he would do something about it.  Dr. Mitchell is also alleged to have spent extra time with another Black employee, Doritha Griffin.  According to plaintiff,

---

[1] Bonita Allen testified at her deposition that she came to Wallace in 1997. (Allen Depo. p. 20). Corey Bowie testified that he was hired in 1994. (Bowie Depo. p. 9).

Mitchell would bypass plaintiff and directly assign Ms. Griffin projects.  Neither of these two employees are similarly-situated and the court finds the alleged disparities do not rise to the level of an adverse employment action.  "[N]ot everything that makes an employee unhappy is an actionable adverse action." Shannon v. BellSouth Telecommunications, Inc., 292 F.3d 712, 716 (11th Cir. 2002) (quoting Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1118 (11th Cir.2001)).  "For there to be an adverse employment action under Title VII, the conduct must alter an employee's compensation, terms, conditions, or privileges of employment." The court finds that Mitchell's alleged preferential treatment of these two subordinates did not alter plaintiff's compensation, terms, conditions, or privileges of employment.  The fact that Dr. Mitchell sometimes spoke about the civil rights movement or opportunities for African-Americans also does not alter the terms, conditions or privileges of plaintiff's employment.

Even if plaintiff had established a prima facie case, defendant has proffered non-discriminatory reasons for its decision not to renew plaintiff's employment contract.  Numerous problems with plaintiff's work were documented by Dr. Mitchell.  While plaintiff asserts that much of his criticism was unwarranted or blown out of proportion, Wallace could decide not to renew its non-tenured employees "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984).  The court also finds that plaintiff has not demonstrated that defendant's proffered reasons are merely pretext.  Plaintiff points to the way Corey Bowie and Bonita Allen were treated, but as discussed above, these employees were not similarly-situated to plaintiff.   Plaintiff also points out her exemplary job history prior to working at Wallace and her outstanding job performance her first year at Wallace.  However, while her previous performance may have had much to do with why she was hired or why her contract was renewed for a second year, Wallace's reasons for not renewing plaintiff a second time are based on problems that arose or came to Mitchell's attention after her first year. Therefore, the court finds that summary judgment is due to be granted as to plaintiff's Title VII claim of racial discrimination.

**2. Sexual Harassment**

There are two ways in which sexual harassment can be actionable under Title VII:

One way is if the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against her. That conclusion logically has to follow, because tangible employment action is defined in a way that includes a change in the terms and conditions of employment. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998). As defined by the Supreme Court, a tangible employment action is "a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761, 118 S.Ct. at 2268; see also, Johnson, 234 F.3d at 512.

* * * *

The second way for sexual harassment to violate Title VII is if it is sufficiently severe and pervasive to effectively result in a change (sometimes referred to as a constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned. This is hostile work environment harassment. See [Burlington Indus., Inc.,] 524 U.S.] at 754, 118 S.Ct. at 2265.

Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1245 (11th Cir. 2004) (footnote omitted). To

establish a prima facie case of sexual harassment in violation of Title VII, a plaintiff must show:

> (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that there is a basis for holding the employer liable. Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1199 (11th Cir.2001).

Bryant v. School Bd. of Miami Dade County, 2005 WL 1669596, *1 (11th Cir. July 19, 2005). The

above elements apply to both hostile work environment and "tangible employment action" claims.

Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1245 n 3 (11th Cir. 2004) (citations omitted).

Plaintiff claims she has suffered both types of sexual harassment.

As to plaintiff's "tangible employment action" claim, Dr. Mitchell denies making any sexual

advances toward plaintiff.   Even plaintiff concedes that Mitchell never directly asked her for sex.

Plaintiff asserts that Mitchell implied a request for sex during his first phone call to her home in February

2002.  Plaintiff also claims that in the Spring of 2002, Dr. Mitchell attempted to get her to come inside

his house by standing in the doorway of his home and staring at her while she waited in a vehicle in his

driveway.  According to plaintiff, Dr. Mitchell also made several suggestive comments - such as that

23

she should be loyal to him and that some women sleep with their bosses to get jobs and promotions.

Although perhaps some of Mitchell's comments were inappropriate, plaintiff never asked Mitchell to

refrain from talking about such subjects and there is no indication that Mitchell was ever made aware

that his actions made plaintiff uncomfortable. Even if these instances could be reasonably perceived as

an invitation for sex, there is no evidence that Mitchell threatened plaintiff with an adverse employment

action if she did not comply.   Moreover, there is no tangible employment action even remotely related

to her allegedly refusing Mitchell's alleged sexual offers.   The terms or conditions of her employment

were not severely or pervasively altered as a result of her non-compliance.  Plaintiff was put on

administrative leave and her contract was not renewed in 2003.  However, there is no evidence that the

non-renewal is linked to her "refusal" of Mitchell's alleged sexual advances.  Mitchell's decision not to

renew plaintiff occurred well after the alleged implied requests for sex.   In fact, after she allegedly

turned down his offers, Dr. Mitchell offered and plaintiff accepted another letter of appointment for

Dean of Students at Wallace, effective September 1, 2002, through August 31, 2003.  The court finds

that plaintiff has not shown a tangible adverse employment action resulting from the alleged incidents.

To the extent plaintiff claims Mitchell's sexual harassment constituted a hostile work

environment, the court also finds that plaintiff has not shown that the harassment was sufficiently severe

or pervasive to alter the terms and conditions of her employment.  "For an atmosphere of sexual

harassment or hostility to be actionable, ... the offending behavior must be sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment." Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 2354, 159

L.Ed.2d 204 (2004) (citations and internal quotations omitted).  The alleged incidents and comments

are simply not severe or frequent enough to constitute a hostile work environment.  Plaintiff does not

allege that Mitchell physically touched plaintiff in any way and most of the sexual comments were

essentially gossip about other employees and were made infrequently.

Even if plaintiff could establish a prima facie case, as discussed above regarding plaintiff's claim

of racial discrimination, defendant has proffered legitimate reasons for not renewing plaintiff's

employment contract and plaintiff has failed to show pretext.  Therefore, summary judgment is due to be granted as to plaintiff's sexual harassment claim.

### 3. Retaliation

Plaintiff claims Wallace retaliated against her for making complaints about Mitchell's harassment to the Chancellor of the Alabama Department of Post Secondary Education.  To establish a prima facie case of retaliation based on circumstantial evidence, the plaintiff must show:

> (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.

Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir.2002) (citations omitted).  Defendant concedes that it is unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 20003-3(a). Internal complaints about sexual harassment or racial discrimination are statutorily-protected activities. See Pipkins v. City of Temple Terrace, Fla, 267 F.3d 1197, 1201 (11th Cir. 2001).  Defendant contends, however, that plaintiff's letter of complaint to the Chancellor did not complain about any sexually harassing or racially discriminate behavior.  Although the letter includes "harassment" and "disparate treatment" in its list of purposes for making the complaint, it does not describe any conduct that is alleged to be sexual or racially motivated.  Moreover, even if the letter qualifies as a statutorily protected expression, there is no evidence that Mitchell had any knowledge of it until at least December 2002.  Mitchell's problems with plaintiff had already been abundantly documented prior to December 2002.  In fact, by plaintiff's own accord, Mitchell began treating her differently immediately following her sending a memo four months earlier that criticized Doritha Griffin.   The court notes that plaintiff's criticism of her subordinate was not a statutorily protected expression.  The court finds that plaintiff has not shown that any adverse action was causally related to the protected expression.

Even if plaintiff could establish a prima facie case, as discussed above regarding plaintiff's claim of racial discrimination, defendant has proffered legitimate reasons for not renewing plaintiff's employment contract and plaintiff has failed to show pretext.  Therefore, summary judgment is due to

be granted as to plaintiff's retaliation claim.

## C. Claim against Mitchell

Plaintiff maintains that Mitchell fraudulently represented that she would not lose anything that she had earned during her years of employment in Alabama's community college system.  More specifically, plaintiff claims that Mitchell fraudulently represented that plaintiff's years of service at her previous jobs would transfer to Wallace and that she would have tenure at Wallace.

A party is liable for a misrepresentation under Alabama law where the party has (1) made a false representation; (2) of a material fact; (3) upon which the plaintiff reasonably relies; and (4) which causes injury or damage to the plaintiff.  See Auburn Ford, Lincoln Mercury, Inc. v. Norred, 541 So.2d 1077, 1080 (Ala. 1989).   Plaintiff claims that Mitchell's statement that she "would not lose anything to come up there and work for him" implied that she would retain her tenure status.  However, tenure was never mentioned by Mitchell or plaintiff during the application and hiring process.  Plaintiff was given ample opportunity to ask questions about the terms and benefits of the position, but there is no evidence that she ever asked Mitchell or other Wallace representatives about tenure.  The formal offer letter did not mention tenure and pointed plaintiff to the  Faculty/ Staff Handbook and Ms. Leigh Ann Morgan in the Business Office for information on certain benefits and payroll related matters.   Plaintiff believed that she would retain her tenure because when she was hired by Bishop State, an employee there, Mary Jane Akel, told her that even though her offer letter stated that she would be a probationary employee, she would still keep her tenure because Bishop State and her previous employer, Faulkner State, were all part of the same system. (Hammons Depo. pp. 227-228).  This representation was not made by Mitchell, but by Ms. Akel.

Even if Mitchell's statement could be reasonably understood to represent that plaintiff's tenure status would transfer, it is questionable whether the representation constitutes a misrepresentation of fact.  Whether plaintiff is entitled to tenure is a question of state law.  Under ALA. CODE § 36-26-101(a) there is a probationary period not to exceed three years for employees of two-year educational institutions under the control of the State Board of Education.  The statute further provides that "[a]t

26

any time during the employee's probationary period, the employing authority may remove an employee by furnishing said employee written notification at least 15 days prior to the effective day of termination" ALA. CODE § 36-26-101(c).  "[T]here is no duty to disclose laws that are accessible and presumed to be known by all." Johnson v. Sorensen, ___So. 2d ___ , 2005 WL 1253829, *7 (Ala. May 27, 2005) (citing Henson v. Estes Health Care Ctr., Inc., 439 So.2d 74 (Ala.1983)).  "[E]veryone is presumed to know the law, and therefore cannot in legal contemplation be deceived by erroneous statements of law." Id. at *8 (quoting Best v. Best, 247 Ala. 627, 629, 25 So.2d 723, 725 (1946)). Misrepresentations of law will only constitute a misrepresentation of fact if the misrepresentation was intended and understood to assert that the proper facts existed to justify the conclusion of law expressed. Id. (quoting Best, supra).  Here it appears that plaintiff and Mitchell both understood that plaintiff had been employed by that institution for less than three years and was deemed a probationary employee.  Plaintiff apparently believed that, although she was a probationary employee, she somehow still retained her tenure status.  Such a conclusion appears to be purely legal and does not appear to have been intended from Mitchell's statement.  An honest misrepresentation of law cannot constitute fraud. See Id.  Thus, the court finds that summary judgment is due to be granted in favor of defendant as to plaintiff's fraud claim.[2]

_____

[2] The court notes that while not raised by defendants, it would appear that plaintiff's fraud claim is also due to be dismissed for statute of limitations reasons.   In Alabama, the statute of limitations for fraudulent misrepresentation claims is two years and begins to run on the date plaintiff discovers, or should have discovered, the fraud and the misrepresentation. Fowler v. Provident Life and Accident Ins. Co.,  256 F.Supp.2d 1243, 1248 (N.D. Ala. 2003) (citing ALA. CODE §§ 6-2-3, 6-2- 38(l ); and Auto-Owners Ins. Co. v. Abston, 822 So.2d 1187, 1194 (Ala. 2001)).  Here the alleged misrepresentation occurred in November 2000 and this case was filed April 26, 2004.   There is some question whether plaintiff knew the falsity of the representation before April 26, 2002, although she clearly was aware of the truth before December 17, 2002, when she sent her letter of complaint to the Chancellor.  Her letter specifically stated that Mitchell had continually reminded her of her non-tenured status.  However, the starting point for the statute of limitations is when she discovered or should have discovered.  As stated above, plaintiff had ample opportunity to check with Wallace's business office concerning her benefits and employment status both before and after she took the position and she is presumed to know the law.

## <u>CONCLUSION</u>

For the reasons stated above, defendants' motion for summary judgment (Doc. 51) is

**GRANTED**.

**DONE and ORDERED** this 9th day of August, 2005.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE

28